GEORGE T. HAMILTON ET AL., APPELLEES, V. WILLIAM V. ALLEN ET AL., APPELLANTS.

FILED MARCH 28, 1910.  No. 15,812.

1. Cross-Appeal: DISMISSAL. Where a full examination of the merits of an appeal shows that cross-appellants are entitled to no relief except that already granted by the trial court, a motion by appellants to dismiss the cross-appeal may be disregarded.

2. Appeal: DISMISSAL: REVIEW. On appeal from a decree in equity, failure of the trial court to dismiss the suit for misjoinder of plaintiffs and of causes of action does not require a reversal, where the record clearly shows appellants were in nowise prejudiced.

3. Attorney and Client: SUIT FOR AN ACCOUNTING: BURDEN OF PROOF. Where attorneys purchase from their clients and resell the subject matter of their employment, the burden is on them, when sued by their clients for resulting profits, to prove the original purchase price was fair.

4. ————: ————: EVIDENCE. In a suit to recover the profits made by attorneys out of an undivided half interest in land purchased from their clients, subject to a life estate, evidence of the prices realized, when the identical property was exchanged or resold at a large profit by the attorneys at various times within a few months, may be considered in determining whether the price paid by the attorneys was fair, where their witnesses testified to the changes in values in the meantime, and that the undivided interest had no market value at the time of the original purchase.

APPEAL from the district court for Madison county: ANSON A. WELCH, JUDGE. *Reversed.*

*William V. Allen, pro se.*

*M. D. Tyler, N. D. Jackson* and *Mapes & Hazen,* for appellants.

*O. A. Abbott* and *James Nichols, contra.*

ROSE, J.

This is a suit in equity to require defendants to account as fiduciaries for the profits made by them out of the interests of plaintiffs in 720 acres of land in Madison county, or as trustees holding title for the benefit of plaintiffs. The realty described was formerly owned by James B. Gibbs, who died intestate without issue June 5, 1901. It seems to be conceded that, under the statutes then in force, his widow, Nancy C. Gibbs, took a life estate in all the land in controversy, and that subject thereto the title descended to six heirs, each inheriting an undivided one-sixth interest. These heirs and their relationship to intestate are as follows: George T. Hamilton, half-brother; Annie Minehart and Matilda Rodeck, half-sisters; Margaret A. Owens and Susan Beck, full sisters; Lizzie M. Mazurie, niece, the only child of a deceased sister of the full-blood. The heirs named are plaintiffs, with the exception of Matilda Rodeck, who died after the death of James B. Gibbs. Her heirs are Ida McKee, Harry Rodeck and William Rodeck, and they are plaintiffs also.

William V. Allen and Willis E. Reed, who were formerly partners as Allen & Reed, and George W. Losey and wife are defendants. Losey was administrator of the Gibbs estate, and by mesne conveyances to which the heirs were not parties acquired title to 160 acres of the Gibbs land. The petition seeks to charge him and his wife as trustees holding title for the benefit of plaintiffs.

John S. Robinson, now deceased, was attorney for the heirs of the full-blood, and during the existence of that relation bought from his clients their undivided half interest, subject to the widow's life estate, taking title in the name of Thomas F. Memminger. The property thus acquired was sold by Robinson, and after his death his clients filed claims against his estate to require an accounting. The county court rejected the claims, and from the disallowance appeals were taken to the district court, where the cases were settled by stipulation. Allen and Reed were attorneys for the heirs of the half-blood, and during the existence of that relation bought from their clients the latter's undivided half interest, subject to the widow's life estate. After the title of all the heirs had been purchased by their attorneys, the latter conveyed to the widow their interest in 160 acres occupied by her as a homestead in exchange for her life estate in the remainder of the 720 acres. Within a short time the property acquired by Allen and Reed from the heirs of the half-blood was resold at a profit. In the petition the attorneys are charged with fraud in suppressing and misrepresenting facts affecting the interests of their clients and the value of their property. Any joint liability of defendants to plaintiffs seems to rest on the following averment of the petition:

"Plaintiffs allege that said William V. Allen, Willis E. Reed and John S. Robinson, not regarding their duties and obligations as such attorneys, as aforesaid, but contriving and intending to procure title to themselves from said heirs at grossly inadequate prices, they, the said William V. Allen, Willis E. Reed, John S. Robinson and defendant, George W. Losey, entered into an agreement to procure conveyances of and from said heirs of their interest in all of said lands, to the end and for the purpose of exchanging a part thereof with the said Nancy C. Gibbs, for a conveyance, satisfaction and release of her life estate in the residue, and holding such residue for the common gain, profit, and advantage of them, the said William V.

Allen, Willis E. Reed, John S. Robinson and George W. Losey."

All charges of fraud and the conspiracy to procure from the heirs their property at grossly inadequate prices and to divide the resulting profits are denied by defendants, and in separate answers by Allen and Reed faithful performance of their duties as attorneys is alleged.

The district court upon a full hearing found, in substance, that there had been no conspiracy formed as pleaded in plaintiffs' petition; that in purchasing the interests of the heirs Allen and Reed and Robinson had no previous understanding among themselves or with the widow as to any future disposition of the property purchased; that there was no fraud or wrongdoing on the part of Losey, and that the conveyances to him were valid; that Allen and Reed were accountable for the profits made by them out of the property purchased from their clients. As to the heirs of the full-blood and Losey and wife the suit was dismissed. Judgment was entered against Allen and Reed in favor of their clients for $11,592.37. Allen and Reed appeal, and plaintiffs have filed a cross-appeal.

Two preliminary matters are presented. The first is a motion by defendants to dismiss the cross-appeal of plaintiffs. It is unnecessary to pass on this motion, since an examination of the entire record in considering the appeal of Allen and Reed has led to the conclusion that the averments upon which cross-appellants seek redress are not established by the evidence. Their right to the relief denied by the trial court depends upon the truth of the allegation that defendants and John S. Robinson entered into and carried out an agreement to procure plaintiffs' title at grossly inadequate prices, or that plaintiffs were injured by the misconduct of Losey or other fiduciaries. The finding of the district court to the effect that the conspiracy pleaded had never been formed is clearly sustained by the evidence. Any claim which the heirs of the full-blood may have had against the estate of John S. Robinson on account of his breach of duty as their attorney

was settled in the district court for Madison county in the cases appealed from the county court, and plaintiffs' right of recovery for injuries growing out of the conspiracy pleaded was lost with their failure to prove that charge. Defendant Losey is not answerable in this suit to any of the plaintiffs, unless he was guilty of a breach of trust or participated in some species of fraud through which they were injured. There was no direct conveyance from the heirs to him, and an examination of every transaction with which he was in any way connected results in the approval of the trial court's finding that he was guilty of no wrong or fraud which made him plaintiffs' trustee, or required him to answer to them for acquiring title with which they had parted. It follows that on the merits of the case the findings assailed by cross-appellants must be approved. A ruling on defendants' motion is therefore unnecessary.

The other preliminary matter is also presented by defendants. They argue that there is a misjoinder of parties plaintiff and of causes of action. Conceding this position to be well taken, when viewed from a technical standpoint, it does not necessarily follow that defendants were prejudiced by the action of the trial court in refusing to dismiss the suit or in deciding the controversy between Allen and Reed and their clients, after it was found that the evidence disclosed no joint liability of defendants to plaintiffs. The suit was one in equity. The court had jurisdiction of the parties. A statute declares that "the court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others." Code, sec. 46. "Judgment may be given for or against one or more of several plaintiffs", says the code, "and for or against one or more of several defendants." Code, sec. 429. The record indicates clearly that, in the adjudication of the controversy between Allen and Reed and their clients, the trial court was not influenced in the slightest degree by testimony relating to other issues or to other parties. Allen and Reed understood

the issues that resulted in the decree against them. In the petition their employment and professional relations were pleaded. The purchase of their clients' property, the prices paid, and what each received, when the property was resold, were also stated. There was a specific prayer for relief as against them, and a prayer for general relief. The petition is held sufficient to require them to account. In separate answers they denied fraud, and pleaded the faithful performance of all their duties as attorneys. They accepted the real issue as to their accountability to their clients, and offered proof to show they paid a fair price for the property purchased. On such a record it cannot be possible that they were prejudiced by the failure to dismiss the suit for the misjoinders challenged, or that the trial court erred to their prejudice in retaining for adjudication the controversy between them and their clients. In these respects the trial court will be sustained.

The important question for determination is: Shall Allen and Reed be required to account for the profits made by them out of the real estate purchased from their clients? The clients lived in Delaware, and what they knew about their inherited property and their rights during the time they held the title was, in a large measure at least, learned either directly or indirectly from their attorneys, Allen and Reed. The employment of counsel and the nature of their professional relations are not open to serious controversy. They had authority in writing from each of their clients, as follows: "I desire you, as attorneys, to look after my interests, whatever they may be, in the estate of James B. Gibbs, late of Madison county, Nebraska, deceased, for which I agree to pay you a reasonable attorney's fee out of my share of the estate." They were authorized to sell their clients' interests in the subject matter of their employment, and the relations continued until they became the purchasers thereof. After some correspondence the clients executed and delivered the following document: "Stanton, Dela-

ware, April 21, 1902. To Messrs. Allen & Reed, Madison, Nebraska. We and each of us do hereby authorize you to sell all our interest in the estate of James B. Gibbs, deceased, for the sum of $3,000 net to us, we to be at no expense and the aforesaid sum of $3,000 to be paid us for our joint interests in the said estate. The purchaser at said sale is to take our interests in the said estate, subject to the dower or other rights of the widow of the said James B. Gibbs in the same, and also subject to the rights or claims of any and all creditors of the said James B. Gibbs in the said estate, and the amount of the above stated consideration shall not be subject to deduction on account of commissions or counsel fees or from any other cause whatsoever; provided that said sale shall be made within sixty days from this date. In witness whereof, we, Annie Minehart, Matilda Rodeck, and George T. Hamilton have hereunto set our hands the day and year aforesaid. Annie Minehart. Matilda Rodeck. George T. Hamilton."

June 14, 1902, Allen and Reed wrote to F. M. Walker, Wilmington, Delaware, a local attorney for the heirs of the half-blood, as follows: "Inclosed herewith please find common form of deed to be signed and acknowledged and witnessed by Hamilton and wife and his two sisters. We expect a Mr. Douglass to take this deed, if he can raise the money; but as you will notice, we have left the grantee blank, and if he fails to produce $3,000 to send to pay for the deed, and also pay us our fees in addition, we will wish to let some other person take same, and if they fail, as a last resort, we will take it ourselves. So please have Hamilton and his sisters sign a letter or statement to the First National Bank of this place to fill into the inclosed deed such person or persons as our firm directs, and deliver deed to us, upon the payment of $3,000, and our firm signing a receipt releasing all claims for attorney's fees, expense, etc. You draw such as we are to sign as you understand the same. Please attend to this at

once as the writer (Reed) must leave for the west to be gone some time."

Following is the reply: "Wilmington, Del., June 26, 1902. Messrs. Allen & Reed, Madison, Nebraska. Dear Sirs: I am sending today through my bank here the executed deed of Hamilton and wife and his sisters to the First National Bank of Madison, with authority to the cashier of the First National Bank of Madison to fill in the name of the grantee .or grantees and deliver on payment of $3,000, as requested by you in your letter of the 14th inst. As you have stated in the deed that the grantee takes subject to dower and creditors' rights of Mr. Gibbs, I do not think it worth while to take any release from them, and as you have stated that the amount to be paid Hamilton and his sisters is $3,000, without any deduction for your counsel fees or other expenses, I am satisfied with your statement in that matter. Hoping that you may be able to close the matter soon, I remain, Very truly yours, F. M. Walker."

The deed, executed in blank by the clients, was received by the First National Bank of Madison during the latter part of June, 1902. June 30, 1902, Allen and Reed directed the bank to insert in the blanks their own names as grantees, and paid the purchase price. Within a few months the property was sold. by them at a large profit. The record shows, and it is proper to say, that the senior member of the firm objected to taking the title of his clients, and only consented when informed that the firm obligation to do so . had already been given. When the attorneys directed the bank to insert their names in the deed, they acted both for themselves and their clients. In that act they united their personal interests with those of their clients. Their conduct was dual in character. Upon these facts equity raises a presumption against the validity of the transaction, which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action. Such is the rule of general acceptation, as applied to dealings between

fiduciaries and their principals in which both parties knowingly and intentionally deal with each other. 2 Pomeroy, Equity Jurisprudence (3d ed.) sec. 957. It is dictated by high considerations of public policy, and springs from the philosophy of the Galilean who declared, "No man can serve two masters", and who prayed, "Lead us not into temptation." It is founded on His divine knowledge of the human heart. The doctrine is firmly established in this state. In a different form it was made applicable to the conduct of executive state officers by a constitutional provision that they shall receive no compensation except their salaries, and that their fees for services shall be paid in advance into the state treasury. The legislature by adopting that part of the common law not inconsistent with the constitution and statutes, has adopted the same rule for the protection of confidential relations. The courts have steadfastly required of attorneys the same high standard of professional accountability, and have consistently enforced the doctrine in both actions at law and suits in equity. A late expression of this court, in an opinion by Judge BARNES, is as follows: "Where the attorney purchases the subject of the suit the client may set aside the purchase at will, unless the attorney shows by clear and conclusive proof that no advantage was taken; that everything was explained to the client, and that the price was fair and reasonable." *Levara v. McNeny*, 73 Neb. 414. The power to enforce this rule does not depend upon proof of actual fraud. Its application is the same whether attorneys abuse their trust or act on generous impulses to assume risks and burdens of clients who are poor. Its enforcement does not involve an inquiry into the motives which prompt clients to sue for profits, when viewed from an ethical standpoint. Solicitude for them on account of their improvident contracts is not the basis of relief. The doctrine is founded on public policy. It is demanded by the welfare of society. It arises from the necessity of protecting proper relations of trust and confidence wherever they exist.

Adherence to a principle which deprives fiduciaries of undue profits lessens the temptation to violate confidential relations.

The attorneys are familiar with the rule stated, and their answer to plaintiffs' demand for its enforcement is that it is shown by uncontradicted evidence that the price paid was the full value of the property purchased. On this issue some of the witnesses expressed opinions as to the value of an heir's undivided one-sixth interest, subject to the widow's life estate. The opinions were based on general knowledge of land values, but knowledge of the value of an undivided sixth or half interest in land subject to a life estate was very meager. Two witnesses, one a banker and the other a dealer in real estate, testified that the interest of each heir, or an undivided one-sixth interest, had no market value, and that its value was purely speculative. They did not state the value for speculative purposes. The testimony of defendant Reed was to the same effect, and in addition he said: "I considered that the undivided one-sixth interest in the 720 acres which was embarrassed with the life estate of Mrs. Gibbs, considering her age and condition of health, was purely speculative, and that $1,000 was really more than it was actually worth, but we figured we might get that amount out of it." It is insisted by the attorneys that this testimony, or testimony of like import, is the only competent proof of value at the time of the original purchase, and that it is uncontradicted and must be accepted as conclusive evidence that the price paid was the fair value of the property. That this is the only alternative cannot be conceded. The property purchased by Allen and Reed was resold within a short time. Copies of their deeds appear in the evidence, and the consideration is correctly stated therein, according to one of the grantors. The prices were fixed by mutual understanding of the parties to the transfers. The trial court made these matters the subject of inquiry. Intestate's land is described in the petition as follows: The west

half of section 6, the southeast quarter of section 5, the southwest quarter of section 7, all in township 22 north, range 2 west of the sixth principal meridian, and the south half of the southwest quarter of section 31, in township 23 north, range 2 west of the sixth principal meridian, and containing, according to government survey, 720 acres, more or less. At the time of the death of Gibbs the northwest quarter of section 6 was occupied by himself and wife as their home, and is described in the record as a homestead. An undivided half interest in this land, subject to the widow's life estate, is what Allen and Reed bought. How they disposed of it, including dates, descriptions, prices and grantees, is shown by the following findings of the district court:

"July 7, 1902, William V. Allen and Willis E. Reed, and their wives, conveyed an undivided one-half interest in the northwest quarter and the north half of the southwest quarter of section six, township twenty-two north, range two west of the sixth principal meridian, to Nancy C. Gibbs; and on the same day Nancy C. Gibbs conveyed to said William V. Allen and Willis E. Reed her life estate in the rest of said land of which the said James B. Gibbs died seized, and paid them $3,000. August 9, 1902, Thomas F. Memminger and wife conveyed the undivided one-half remainder in the northwest quarter and the north half of the southwest quarter of section six, township twenty-two north, range two west of the sixth principal meridian, to Nancy C. Gibbs, for which she paid nothing, but the same was in part fulfillment of an agreement to vest the fee title thereof in her by the said Allen and Reed."

"August 9, 1902, William V. Allen and wife, Willis E. Reed and wife, and Thomas F. Memminger and wife, at the request of John S. Robinson, conveyed to John Prauner, Jr., the south half of the southwest quarter of section thirty-one, township twenty-three north, range two west of the sixth principal meridian, for which Allen and Reed received $3,600. About the same day said Allen

and wife and said Reed and wife conveyed to George W. Losey the undivided one-half of the southeast quarter of section five, township twenty-two north, range two west of the sixth principal meridian, for $3,250. The same day Thomas F. Memminger and wife conveyed to said Losey the undivided one-half of the same premises for $3,250. January 5, 1903, Memminger and wife for one dollar conveyed to John S. Robinson and George W. Losey the undivided one-half of the southwest quarter of section seven, and the south half of the southwest quarter of section six, all in township twenty-two north, range two west of the sixth principal meridian; and January 3, 1903, said Allen and said Reed and their wives, and John S. Robinson and his wife, and George W. Losey and his wife conveyed to Vaclav Dvorak the southwest quarter of section seven, township twenty-two north, range two west of the sixth principal meridian, for $7,500; and January 16, 1903, said Allen and wife and Reed and wife, Robinson and wife and George W. Losey and wife conveyed the south half of the southwest quarter of section six, township twenty-two north, range two west of the sixth principal meridian, to Ralph E. Simmons for $3,500. That by the aforesaid several transfers and conveyances of said lands, and as consideration therefor, the said defendants Allen and Reed have received from the interests therein of their said clients, George T. Hamilton, Matilda Rodeck and Annie Minehart, the several sums respectively set forth and at the dates as follows, to wit: August 9, 1902, of Nancy C. Gibbs, $3,000; of George W. Losey, $3,250; of John Prauner, Jr., $1,800; January 3, 1903, of W. M. Dvorak, $3,750; February 16, 1903, of Ralph E. Simmons, $1,750; total $13,550; and that said Allen and Reed have paid out on account of said sales and interests of their said clients in the aforesaid real estate the several sums, at the dates set forth, as follows: June 30, 1902, to their said clients $3,000; August 9, 1902, to the said John S. Robinson to procure a conveyance to the widow of said James B. Gibbs of the interest of his clients

in the 240 acres conveyed to said widow, and to procure a settlement of the claim of Margaret A. Owens against said estate, $2,000; total $5,000."

It thus appears that on what amounted to an investment of $5,000 in the clients' property June 30, 1902, the attorneys realized on exchanges and resales between that date and February 16, 1903, $13,550. May the prices on resale be considered as evidence that the price paid to the clients was unfair? The prices on resale are shown by deeds admitted in evidence. On cross-examination defendant Reed was asked: "And within six months from the time you made your purchase, you sold all of this land, and none of it for less than $40 an acre?" This was answered without objection: "The respective deeds show the consideration." The considerations proved by deeds and oral testimony are not opinions based on knowledge of sales of other lands, but are positive proofs of the actual prices realized from mutual and voluntary exchanges and sales of the identical interests purchased. Subsequent changes in the prices are explained. Reed testified that in 1902 prices increased after the purchase $10 to $15 an acre, but a dealer in real estate made an estimate of $2.50 to $7 an acre. With this explanation of the rise in prices after the original purchase, there is no good reason why realized prices amounting to $13,550 for an undivided half interest, when mutually and voluntarily agreed upon by the parties to the resales, should be wholly excluded as evidence of value at the time of the original purchase. The burden was on the attorneys to show by "clear and conclusive proof that no advantage was taken" and that "the price was fair and reasonable." The proof was directed to those questions. The purpose of the testimony is not to fix the precise sum which shall be paid for land taken from the owner without his consent. Proof of what the undivided half interest brought on resale should not be rejected in the present case, under the rule that in a proceeding to condemn land for railway purposes the owner should not be required to state on cross-

examination what he previously paid for land intersected by the right of way. *Dietrichs v. Lincoln & N. W. R. Co.,* 12 Neb. 225; *Omaha S. R. Co. v. Todd,* 39 Neb. 818; *Chicago, R. I. & P. R. Co. v. Griffith,* 44 Neb. 690. Testimony that an undivided sixth interest subject to the widow's life estate had no market value, and the meager general knowledge on which defendant Reed based his opinion that the estate mentioned was not worth $1,000, suggest a substantial reason for considering, in connection with proof of the rise in values, evidence that the undivided half interest purchased by the attorneys was exchanged or resold for $13,550 within a short time. In *Rawson v. Prior,* 57 Vt. 612, the court said: "What property sells for, which has no regular market price, *may* be proper evidence tending to show its value."

Upon a showing of the fiduciary relation, and that the fiduciary purchased the property of his principal and sold it within a short time at a large advance, the fiduciary, under the rule in equity heretofore stated, is chargeable, *prima facie,* with the profits made upon the resale. The principal in such a case is not put to the burden of proving the actual market value at the date of conveyance to the fiduciary. That rule necessarily implies that the price actually received upon a resale by the fiduciary is provable against him. In view of the great disparity between the price paid by Allen and Reed and the prices received by them, proof that the actual increase in the market value of lands was not more than from $2.50 to $15 an acre certainly warrants a finding that the price paid by them was below the fair value, under the rule which makes the prices at which they conveyed competent proof against them.

Another consideration which leads to the conclusion that the proofs are not sufficient to warrant a denial of relief to the clients is that on July 7, 1902, seven days after the delivery of the deed by which the attorneys took title, they had entirely disincumbered their title of the embarrassment of the widow's life estate. This was ac-

complished by their obtaining her deed of conveyance of 480 acres and $3,000 in exchange for their own deed and the deed of their cotenant in the remainder, or fee estate in 240 acres, to the widow. This adjustment, which operated to make the title merchantable, was well nigh contemporaneous with their own acquisition of title. Their previous employment as attorneys to safeguard the interests of their clients in these lands, enlarged by express written power to sell, obligated them to bestow their skill and judgment in their clients' cause, and to give full advice as to the most appropriate means of disentangling and disincumbering the title of the life estate of the widow, so that the property of the clients would become merchantable. Where this object is fairly within the purview of the retainer, so that completion of the service of the attorneys may be expected to make the title a merchantable one, equity will not regard as conclusive a showing of value based upon the hypothesis that the embarrassment of the title which gave rise to the retainer made the lands unmerchantable. Without disparaging the motives of the attorneys whose dealings are here in question, any other rule would permit attorneys, after having ascertained by their employment that there was a feasible and practicable method of terminating the life estate by conveying to the life tenant the fee of a fractional area of the lands, to justify their own acquisition of title at a depreciated valuation, when their knowledge derived by their employment in a confidential relationship assured them of their area of merchantable land. Equity does not sanction any rule which, in a situation so sensitive, affords a motive or temptation to profit by betrayal of fiduciary obligations. So, upon the undisputed facts disclosed by the record, the court is not bound or concluded by testimony that the value of an undivided one-sixth interest in the lands, embarrassed by the life estate of the widow, was of no market value, or that its market value was not in excess of $1,000, the sum paid. The proof of the attorneys as to value was directed principally to a one-sixth

interest. In the present case the three heirs had previously authorized a sale of their entire interest, and they in fact joined in one deed. The latter fact, while material, is not the controlling consideration. The vital consideration is the confidential relationship. Under their employment the attorneys had opportunity to gain special knowledge of means to clear the title, and of the actual worth of the interests acquired, and of speedy means of disposal on the footing of a merchantable title. To permit them now to justify upon a showing of depreciated value of a small interest in an embarrassed title, as rated in the market in the estimation of dealers in real estate generally, would operate, practically, to relieve them of their just burdens of accountability as fiduciaries.

When evidence of the prices on resale is considered, the attorneys have not shown by clear and convincing proofs that the price paid to their clients was fair. On the contrary, the proper deduction from all the evidence is that the price was inadequate. The right of the clients to an accounting is therefore established. This conclusion makes it unnecessary to inquire into the correctness of the several findings of the trial court or into its reasons for its decree. It was conceded in oral argument by counsel for plaintiffs, however, that the judgment was excessive, and permission will be given to the district court to correct any errors in the account as set out in the decree. It further appears from documents quoted herein that expenses incurred and fees earned by Allen and Reed were parts of the consideration for the interests purchased, and the circumstances are such that, upon proper evidence, they should be credited with these items; the amounts, as to reasonableness, to be determined by the trial court. To this end the attorneys will be permitted to make the necessary proof, if they so desire. For these purposes the judgment is reversed and the cause remanded for further proceedings.

REVERSED.